## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice<br>Antitrust Division<br>1401 H Street, NW<br>Suite 3000<br>Washington, D.C. 20530,<br><br>       Plaintiff,<br><br>       v.<br><br>VULCAN MATERIALS COMPANY<br>1200 Urban Center Drive<br>Birmingham, AL 35242,<br><br>and<br><br>FLORIDA ROCK INDUSTRIES, INC.<br>155 East 21st Street<br>Jacksonville, FL 32206,<br><br>       Defendants. | CASE NO.:<br><br>JUDGE:<br><br>DECK TYPE:  Antitrust<br><br>DATE STAMP: |

## COMPLAINT

Plaintiff United States of America ("United States"), acting under the direction of the Acting Attorney General of the United States, brings this civil antitrust action to obtain equitable and other relief against defendants Vulcan Materials Company ("Vulcan") and Florida Rock Industries, Inc. ("Florida Rock") to prevent Vulcan's proposed acquisition of Florida Rock. Plaintiff complains and alleges as follows:

## I.    NATURE OF THE ACTION

1.    On February 19, 2007, Vulcan and Florida Rock signed a definitive agreement for Vulcan to acquire Florida Rock in a cash-and-stock transaction valued at approximately $4.6 billion. The total blended cash-and-stock consideration for this transaction is approximately $68 per share.

2.    Vulcan and Florida Rock both produce and distribute in the United States building materials, including, among other things, construction aggregates (which includes coarse aggregate) and ready mix concrete. Vulcan is the largest supplier of construction aggregates in the United States. Florida Rock is also a leading supplier of construction aggregates in the United States. Combined, Vulcan and Florida Rock will have construction aggregates reserves totaling approximately 13.9 billion tons.

3.    The United States brings this action to prevent the proposed acquisition of Florida Rock by Vulcan because it would substantially lessen competition in the production, distribution, and sale of coarse aggregate in and around Atlanta, Georgia; Columbus, Georgia; Chattanooga, Tennessee; and South Hampton Roads, Virginia, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.    PARTIES TO THE PROPOSED TRANSACTION

4.    Defendant Vulcan is a New Jersey corporation with its principal place of business in Birmingham, Alabama. Vulcan produces, distributes, and sells, among other products, construction aggregates, ready mix concrete, hot mix asphalt, and asphalt coating to customers in 21 states, the District of Columbia, and Mexico.

5.     Vulcan is the largest producer of construction aggregates in the United States. It has over 300 facilities for the production and distribution of construction aggregates and other products. In 2006, Vulcan shipped approximately 255 million tons of construction aggregates, the majority of which were coarse aggregate. In 2006, Vulcan reported total sales of approximately $3 billion.

6.     Defendant Florida Rock is a Florida corporation with its principal place of business in Jacksonville, Florida. Florida Rock produces, distributes, and sells in the Southeastern and mid-Atlantic states, among other products, construction aggregates, ready mix concrete, prestressed concrete, and cement.

7.     Florida Rock is one of the largest United States suppliers of construction aggregates. In 2006, Florida Rock shipped approximately 45 million tons of construction aggregates, the majority of which was coarse aggregate. In 2006, Florida Rock reported total sales of approximately $1.4 billion.

## III.    JURISDICTION AND VENUE

8.     Plaintiff United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

9.     Defendants produce, distribute, and sell coarse aggregate and other products in the flow of interstate commerce. Defendants' activities in producing, distributing, and selling these products substantially affect interstate commerce. This Court has subject matter jurisdiction over this action pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

10. Defendants have consented to venue and personal jurisdiction in this judicial district.

## IV. TRADE AND COMMERCE

### A. The Relevant Product Market

11. Construction aggregates consist primarily of crushed stone, gravel, and sand produced from natural deposits of various materials and removed from quarries, mines, or pits.

12. Coarse aggregate is a type of construction aggregates. Coarse aggregate is crushed stone produced at quarries or mines and used for, among other things, road base and the production of ready mix concrete and asphalt. Coarse aggregate typically is mixed with other materials to produce ready mix concrete and asphalt. Different sizes of coarse aggregate are needed to meet different project specifications.

13. There are no reliable substitutes for coarse aggregate because it differs from other products in its physical composition, functional characteristics, customary uses, consistent availability, and pricing. To the extent that any substitutes exist, customers already use these to the full extent possible in light of the limits on their availability and the amounts that can be used in a given product, and could not use more of them in place of coarse aggregate in response to an increase in the price of coarse aggregate.

14. A small but significant post-acquisition increase in the price of coarse aggregate would not cause the purchasers of coarse aggregate to substitute another product or otherwise reduce their usage of coarse aggregate in sufficient quantities so as to make such a price increase unprofitable.

4

15. Accordingly, the production, distribution, and sale of coarse aggregate is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**B.    The Relevant Geographic Markets**

16. Coarse aggregate is a bulky, heavy, and relatively low-value product. The cost of transporting coarse aggregate is high compared to the value of the product.

17. Transportation costs limit the distance coarse aggregate can be economically transported from a quarry or mine to a job site or a ready mix concrete or asphalt plant. The geographic area within which a coarse aggregate supplier can compete most vigorously thus is limited by the cost of hauling the coarse aggregate. As a result, the competitiveness of a coarse aggregate supplier in a given area is limited by its distance from customer plants or project sites relative to other suppliers.

18. Florida Rock owns and operates a coarse aggregate quarry located in Cedarton, Georgia, known as the Six Mile quarry. This quarry serves a geographic area that includes, among other areas, all or part of Floyd, Polk, Haralson, and Bartow Counties in Georgia (hereafter referred to as "Northwest Atlanta"). Customers with plants or jobs within Northwest Atlanta may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Adairsville, Bartow, and Rockmart quarries and from another competitor's quarry located in Cartersville, Georgia. Other quarries cannot on a regular basis compete successfully for customers with plants or jobs in Northwest Atlanta because they are too far away and the hauling costs are too great.

19. A small but significant post-acquisition increase in the price of coarse aggregate to customers with plants or jobs in Northwest Atlanta would not cause those customers to

procure coarse aggregate from quarries farther away than those identified in paragraph 18 in sufficient quantities so as to make such a price increase unprofitable.

20.    Florida Rock owns and operates a coarse aggregate quarry located in Yorkville, Georgia, known as the Paulding quarry.  This quarry serves a geographic area that includes, among other areas, all or part of Paulding, Douglas, Carroll, Haralson, Polk, and Cobb Counties in Georgia (hereafter referred to as "West Atlanta").  Customers with plants or jobs within West Atlanta may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Villa Rica, Kennesaw, and Lithia Springs quarries and from the quarries of other competitors located in Dallas, Georgia, and Douglasville, Georgia.  Other quarries cannot on a regular basis compete successfully for customers with plants or jobs in West Atlanta because they are too far away and the hauling costs are too great.

21.    A small but significant post-acquisition increase in the price of coarse aggregate to customers with plants or jobs in West Atlanta would not cause those customers to procure coarse aggregate from quarries farther away than those identified in paragraph 20 in sufficient quantities so as to make such a price increase unprofitable.

22.    Florida Rock owns and operates a coarse aggregate quarry located in Tyrone, Georgia, known as the Tyrone quarry.  This quarry serves a geographic area that includes, among other areas, all or part of Fulton, Coweta, Fayette, and Clayton Counties in Georgia (hereafter referred to as "Southwest Atlanta").  Customers with plants or jobs within Southwest Atlanta may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Madras quarry and from another competitor's quarry located in Tyrone,

Georgia.  Other quarries cannot on a regular basis compete successfully for customers with plants or jobs in Southwest Atlanta because they are too far away and the hauling costs are too great.

23.    A small but significant post-acquisition increase in the price of coarse aggregate to customers with plants or jobs in Southwest Atlanta would not cause those customers to procure coarse aggregate from quarries farther away than those identified in paragraph 22 in sufficient quantities so as to make such a price increase unprofitable.

24.    Florida Rock owns and operates a coarse aggregate quarry located in Riverdale, Georgia, known as the Forest Park quarry.  This quarry serves a geographic area that includes, among other areas, all or part of Fulton, Clayton, Henry, DeKalb, and Fayette Counties in Georgia (hereafter referred to as "South Atlanta").  Customers with plants or jobs within South Atlanta may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Red Oak quarry and from another competitor's quarry located in College Park, Georgia.  Other quarries cannot on a regular basis compete successfully for customers with plants or jobs in South Atlanta because they are too far away and the hauling costs are too great.

25.    A small but significant post-acquisition increase in the price of coarse aggregate to customers with plants or jobs in South Atlanta would not cause those customers to procure coarse aggregate from quarries farther away than those identified in paragraph 24 in sufficient quantities so as to make such a price increase unprofitable.

26.    Florida Rock owns and operates a coarse aggregate quarry located in Zotella, Georgia, known as the Griffin quarry.  This quarry serves a geographic area that includes, among other areas, all or part of Spalding and Henry Counties in Georgia (hereafter referred to as

"Southeast Atlanta"). Customers with plants or jobs within Southeast Atlanta may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Stockbridge quarry. In addition, Vulcan is in the process of opening a new quarry in Butts County, Georgia, expected to be operational in 2008, from which it plans to serve, among other areas, customers in all or part of Southeast Atlanta. Other quarries cannot on a regular basis compete successfully for customers with plants or jobs in Southeast Atlanta because they are too far away and the hauling costs are too great.

27.    A small but significant post-acquisition increase in the price of coarse aggregate to customers with plants or jobs in Southeast Atlanta would not cause those customers to procure coarse aggregate from quarries farther away than those identified in paragraph 26 in sufficient quantities so as to make such a price increase unprofitable.

28.    Florida Rock owns a majority interest in a company that owns and operates a coarse aggregate quarry located in Columbus, Georgia, known as the Columbus quarry. This quarry serves a geographic area that includes, among other areas, all or part of Muscogee and Harris Counties in Georgia (hereafter referred to as "Columbus"). Customers with plants or jobs within Columbus may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Barin quarry and from another competitor's quarry located in Midland, Georgia. Other quarries cannot on a regular basis compete successfully for customers with plants or jobs in Columbus because they are too far away and the hauling costs are too great.

29.    A small but significant post-acquisition increase in the price of coarse aggregate to customers with plants or jobs in Columbus would not cause those customers to procure coarse

aggregate from quarries farther away than those identified in paragraph 28 in sufficient quantities so as to make such a price increase unprofitable.

30.    Florida Rock owns and operates a coarse aggregate quarry located in Chattanooga, Tennessee, known as the Jersey Pike quarry. This quarry serves a geographic area that includes, among other areas, all or part of Hamilton County in Tennessee (hereafter referred to as "Chattanooga"). Customers with plants or jobs within Chattanooga may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Chattanooga quarry and from another competitor's quarries located in Chattanooga and Ringgold, Georgia. Other quarries cannot on a regular basis compete successfully for customers with plants or jobs in Chattanooga because they are too far away and the hauling costs are too great.

31.    A small but significant post-acquisition increase in the price of coarse aggregate to customers with plants or jobs in Chattanooga would not cause those customers to procure coarse aggregate from quarries farther away than those identified in paragraph 30 in sufficient quantities so as to make such a price increase unprofitable.

32.    Florida Rock owns and operates a coarse aggregate quarry located in Richmond, Virginia, known as the Richmond quarry, a coarse aggregate quarry located in Havre de Grace, Maryland, known as the Havre de Grace quarry, and a barge-served distribution yard located in Chesapeake, Virginia, known as the Gilmerton yard. Florida Rock also operates a distribution yard owned by a third party located in Chesapeake, Virginia. Via these distribution yards, Florida Rock serves a geographic area that includes, among other areas, all or part of the cities of Norfolk, Suffolk, Portsmouth, Chesapeake, and Virginia Beach in Virginia (hereafter referred to

9

as "South Hampton Roads"). Customers with plants or jobs within South Hampton Roads may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan rail and barge terminals supplied by Vulcan's Richmond, Lawrenceville, and Skippers quarries. Other quarries cannot on a regular basis compete successfully for customers with plants or jobs in South Hampton Roads because they do not have appropriate distribution facilities in the area and/or quarries similarly proximate to rail lines or navigable water sources.

33.    A small but significant post-acquisition increase in the price of coarse aggregate to customers with plants or jobs in South Hampton Roads would not cause those customers to procure coarse aggregate from quarries farther away than those identified in paragraph 32 in sufficient quantities so as to make such a price increase unprofitable.

34.    Accordingly, the relevant geographic markets, within the meaning of Section 7 of the Clayton Act, are locations of coarse aggregate customers in:  Northwest Atlanta, West Atlanta, Southwest Atlanta, South Atlanta, Southeast Atlanta, Columbus, Chattanooga, and South Hampton Roads.

### C.    Anticompetitive Effects

#### 1.    The Proposed Transaction Will Harm Competition in the Markets for Coarse Aggregate in the Relevant Geographic Markets.

35.    Price competition between Vulcan and Florida Rock in the production, distribution, and sale of coarse aggregate has benefited customers.

36.    In Southeast Atlanta and South Hampton Roads, the proposed acquisition will eliminate the competition between Vulcan and Florida Rock and reduce the number of suppliers of many specifications of coarse aggregate from two to one. In Southeast Atlanta, the acquisition

will also eliminate the competition between Florida Rock and Vulcan that would result from the opening of Vulcan's new quarry in Butts County.

37.    In Northwest Atlanta, Southwest Atlanta, South Atlanta, Columbus, and Chattanooga, the proposed acquisition will eliminate the competition between Vulcan and Florida Rock and reduce the number of coarse aggregate suppliers from three to two generally, and for some customers and projects from two to one.

38.    In West Atlanta, the proposed acquisition will eliminate the competition between Vulcan and Florida Rock and reduce the number of coarse aggregate suppliers from four to three generally, and for some customers and projects from three to two.

39.    The proposed acquisition will substantially increase the likelihood that Vulcan will unilaterally increase the price of coarse aggregate to a significant number of customers in Northwest Atlanta, West Atlanta, Southwest Atlanta, South Atlanta, Southeast Atlanta, Columbus, Chattanooga, and South Hampton Roads.

40.    The response of other coarse aggregate suppliers in the relevant geographic markets would not be sufficient to constrain a unilateral exercise of market power by Vulcan after the acquisition because those suppliers likely would not have sufficient capacity and/or incentives to increase production and sales enough to defeat an anticompetitive price increase by Vulcan. State permits and county zoning restrictions in many cases limit quarries' hours of operation and/or production levels, and many coarse aggregate suppliers face practical limitations on the amount of truck traffic their facilities can handle. Moreover, because coarse aggregate mined from quarries is a depletable natural resource and every quarry has finite reserves, every sale by a supplier today represents a tradeoff against future sales.

11

41.    In addition, and notwithstanding competitor responses, post-merger Vulcan will be able to increase prices to those customers that have plants or job sites for which both a Vulcan quarry and a Florida Rock quarry are closer than any other quarries producing coarse aggregate meeting their specifications. Coarse aggregate suppliers know the locations of their competitors' quarries and the distance from their own quarries and their competitors' quarries to a customer's plant or job site. Generally, because of transportation costs, the farther a supplier's closest competitor is from a job site, the less price competition that supplier faces for that project. Post-acquisition, in instances where Vulcan and Florida Rock quarries would be the closest quarries to a customer's plant or project and the next closest coarse aggregate supplier's plant is farther from the customer's plant or project, the combined firm, using the knowledge of its competitors' quarry locations, would be able to charge such customers higher prices.

42.    Without the constraint of competition between Vulcan and Florida Rock, the combined firm will have a greater ability to exercise market power by raising prices to customers for whom Vulcan or Florida Rock were sources of coarse aggregate.

43.    In addition, Vulcan's elimination of Florida Rock as an independent competitor in the production, distribution, and sale of coarse aggregate is likely to facilitate anticompetitive coordination among the remaining coarse aggregate suppliers in Northwest Atlanta, West Atlanta, Southwest Atlanta, South Atlanta, Columbus, and Chattanooga. Coarse aggregate is homogeneous and suppliers have access to information about competitors' output, capacity, and costs. Given these market conditions, eliminating one of the few coarse aggregate competitors is likely to further increase the ability of the remaining competitors to coordinate successfully.

44.    The transaction therefore will substantially lessen competition in the production, distribution, and sale of coarse aggregate in the relevant geographic markets. This is likely to lead to higher prices for the ultimate consumers of coarse aggregate, in violation of Section 7 of the Clayton Act.

2.    **Entry is Not Likely to Deter the Exercise of Market Power.**

45.    Timely and successful entry into the production, distribution, and sale of coarse aggregate is unlikely in the relevant geographic areas.

46.    Securing the proper site for a coarse aggregate quarry or mine is difficult, time-consuming, and costly. It requires the investigation and extensive testing of candidate sites, as well as negotiating necessary land transfers, leases, and/or easements. The location of a quarry, mine, or yard is important due to the high cost of transporting coarse aggregate, but there are few sites, especially in metropolitan areas, on which to locate coarse aggregate operations.

47.    Due to the geology in South Hampton Roads, coarse aggregate for most applications in South Hampton Roads is produced outside the area. For an entrant to compete effectively in South Hampton Roads with a combined Vulcan and Florida Rock, that entrant must pair a new or existing rail- or water-served quarry with a distribution yard in the South Hampton Roads area that is capable of receiving coarse aggregate from such a quarry. Rail- or water-served quarries situated to compete effectively in South Hampton Roads, and the proper sites for distribution yards to serve those quarries, are scarce.

48.    Obtaining necessary zoning variances and governmental permits for a coarse aggregate quarry or mine also can be difficult, time-consuming, and costly. In metropolitan areas, land of the necessary size and geology often is already utilized or does not have the

13

appropriate zoning, and obtaining zoning variances can be extremely difficult. Attempts to open

a new coarse aggregate quarry or mine, especially in metropolitan areas (such as West Atlanta,

Southwest Atlanta, South Atlanta, Columbus, Chattanooga, and South Hampton Roads) but also

frequently in rural areas, often face fierce public opposition. This public opposition can prevent

a coarse aggregate quarry or mine from opening or make opening it much more time-consuming

and costly. In addition, state and federal water, air quality, and other permitting process

requirements must be met.

49.     Even after a quarry or mine site is acquired and properly zoned and permitted, the

owner must spend significant time and resources to prepare the land and install the equipment

necessary to run the operation.

50.     Therefore, entry by any other firm into the coarse aggregate market in the relevant

geographic areas will not be timely, likely, or sufficient to defeat an anticompetitive price

increase.

## V.     VIOLATIONS ALLEGED

51.     The proposed acquisition of Florida Rock by Vulcan would substantially lessen

competition and tend to create a monopoly in interstate trade and commerce in violation of

Section 7 of the Clayton Act, 15 U.S.C. § 18.

52.     Unless restrained, the transaction will have the following anticompetitive effects,

among others:

> a.     actual and potential competition between Vulcan and Florida Rock in the
>
> production, distribution, and sale of coarse aggregate in the relevant
>
> geographic markets will be eliminated;

14

b.      competition generally in the production, distribution, and sale of coarse

aggregate in the relevant geographic markets will be substantially

lessened; and

c.      prices for coarse aggregate in the relevant geographic markets likely will

increase.

## VI.    REQUEST FOR RELIEF

53.    Plaintiff requests that:

a.      Vulcan's proposed acquisition of Florida Rock be adjudged and decreed to

be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C.

§ 18;

b.      defendants and all persons acting on their behalf be permanently enjoined

and restrained from consummating the proposed acquisition or from

entering into or carrying out any contract, agreement, plan, or

understanding, the effect of which would be to combine Vulcan with the

operations of Florida Rock;

c.      plaintiff be awarded its costs for this action; and

d.    plaintiff receive such other and further relief as the Court deems just and

proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:


_____          _____
Thomas O. Barnett                  Maribeth Petrizzi
Assistant Attorney General         Chief, Litigation II Section
D.C. Bar #426840                   D.C. Bar #435204


_____          _____
David L. Meyer                     Dorothy B. Fountain
Deputy Assistant Attorney General  Assistant Chief, Litigation II Section
D.C. Bar #414420                   D.C. Bar #439469


_____          _____
Patricia A. Brink                  Robert W. Wilder
Deputy Director of Operations      Helena Gardner
                                   Christine A. Hill (D.C. Bar #461048)
                                   Leslie Peritz
                                   Lowell Stern (D.C. Bar #440487)
                                   James S. Yoon (D.C. Bar #491309)
                                   Attorneys
                                   United States Department of Justice
                                   Antitrust Division, Litigation II Section
                                   1401 H Street, NW, Suite 3000
                                   Washington, D.C.  20530
                                   (202) 307-6336

                                   Dated:  November 13, 2007

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Vulcan Materials Company, and Florida Rock Industries, Inc. |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)** ___88888___
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Robert W. Wilder
U.S. Department of Justice, Antitrust Division
1401 H Street, N.W., Suite 3000
Washington, D.C. 20530
Tel: (202) 307-6336

ATTORNEYS (IF KNOWN)

Joseph Larson, Esquire
Wachtell, Lipton, Rosen & Katz LLP
51 West 52nd Street
New York, New York 10019
(212) 403-1000

Laura Wilkinson, Esquire
Weil, Gotshal & Manges LLP
1300 I Street, NW
Washington, D.C. 20005
(202) 682-7005

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- (●) 1 U.S. Government Plaintiff
- ( ) 2 U.S. Government Defendant
- ( ) 3 Federal Question (U.S. Government Not a Party)
- ( ) 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ( ) 1 | ( ) 1 | Incorporated or Principal Place of Business in This State | ( ) 4 | ( ) 4 |
| Citizen of Another State | ( ) 2 | ( ) 2 | Incorporated and Principal Place of Business in Another State | ( ) 5 | ( ) 5 |
| Citizen or Subject of a Foreign Country | ( ) 3 | ( ) 3 | Foreign Nation | ( ) 6 | ( ) 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**(●) A. Antitrust**

- [X] 410 Antitrust

**( ) B. Personal Injury/ Malpractice**

- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Medical Malpractice
- [ ] 365 Product Liability
- [ ] 368 Asbestos Product Liability

**( ) C. Administrative Agency Review**

- [ ] 151 Medicare Act

**Social Security:**
- [ ] 861 HIA ((1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g)
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g)

**Other Statutes**
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 890 Other Statutory Actions (If Administrative Agency is Involved)

**( ) D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**( ) E. General Civil (Other)        OR        ( ) F. Pro Se General Civil**

**Real Property**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent, Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**Personal Property**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**Bankruptcy**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

**Property Rights**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

**Federal Tax Suits**
- [ ] 870 Taxes (US plaintiff or defendant
- [ ] 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- [ ] 610 Agriculture
- [ ] 620 Other Food &Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 RR & Truck
- [ ] 650 Airline Regs
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

**Other Statutes**
- [ ] 400 State Reapportionment
- [ ] 430 Banks & Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation

- [ ] 470 Racketeer Influenced & Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Satellite TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 900 Appeal of fee determination under equal access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. Habeas Corpus/ 2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Acquisition of Florida Rock Industries, Inc., by Vulcan Materials Company, would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ _____ <br> JURY DEMAND: | Check YES only if demanded in complaint <br> YES ☐  NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  11/13/2007    SIGNATURE OF ATTORNEY OF RECORD  _Robert Wilder_

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C.. and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: |
| Plaintiff, | |
| | JUDGE: |
| v. | |
| | DECK TYPE:  Antitrust |
| VULCAN MATERIALS COMPANY and FLORIDA ROCK INDUSTRIES, INC., | |
| | DATE STAMP: |
| Defendants. | |

**PLAINTIFF UNITED STATES'**
**EXPLANATION OF CONSENT DECREE PROCEDURES**

Plaintiff United States of America ("United States") submits this short memorandum summarizing the procedures regarding the Court's entry of the proposed Final Judgment.  This Judgment would settle this case pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. §§ 16(b)-(h) (the "APPA"), which applies to civil antitrust cases brought and settled by the United States.

1.    Today, the United States has filed a Complaint, Hold Separate Stipulation and Order, proposed Final Judgment, and Competitive Impact Statement.  The parties have agreed that the Court may enter the proposed Final Judgment following compliance with the APPA.

2.    The APPA requires that the United States publish the proposed Final Judgment and Competitive Impact Statement in the *Federal Register* and in certain newspapers at least sixty (60) days prior to entry of the proposed Final Judgment.  The notice will inform members of the public that they may submit comments about the proposed Final Judgment to the United

1

States Department of Justice, Antitrust Division (*see* 15 U.S.C. §§ 16(b)-(c)).

      3.     During the sixty-day period, the United States will consider, and at the close of that period respond to, any comments that it has received, and it will publish the comments and the United States' responses in the *Federal Register*.

      4.     After the expiration of the sixty-day period, the United States will file with the Court the comments and the United States' responses, and it may ask the Court to enter the proposed Final Judgment (unless the United States has decided to withdraw its consent to entry of the Final Judgment, as permitted by paragraph IV(A) of the Hold Separate Stipulation and Order, *see* 15 U.S.C. § 16(d)).

      5.     If the United States requests that the Court enter the proposed Final Judgment after compliance with the APPA, 15 U.S.C. §§ 16(e)-(f), then the Court may enter the Final

Judgment without a hearing, provided that it concludes that the Final Judgment is in the public interest.

Dated: November 13, 2007                     Respectfully submitted,

                                             PLAINTIFF UNITED STATES OF AMERICA:

                                             Robert Wilder
                                             Helena Gardner
                                             Christine A. Hill (D.C. Bar #461048)
                                             Leslie Peritz
                                             Lowell Stern (D.C. Bar #440487)
                                             James S. Yoon (D.C. Bar #491309)
                                             Attorneys
                                             U.S. Department of Justice
                                             Antitrust Division
                                             Litigation II Section
                                             1401 H Street, N.W.
                                             Suite 3000
                                             Washington, D.C.  20530
                                             Tel:  (202) 307-6336

3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CASE NO.: |
| | JUDGE: |
| v. | DECK TYPE:  Antitrust |
| VULCAN MATERIALS COMPANY and FLORIDA ROCK INDUSTRIES, INC., | DATE STAMP: |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Robert Wilder, hereby certify that on November 13, 2007, I caused a copy of the foregoing Complaint, Hold Separate Stipulation and Order, proposed Final Judgment, Competitive Impact Statement, and Explanation of Consent Decree Procedures to be served upon defendants VULCAN MATERIALS COMPANY and FLORIDA ROCK INDUSTRIES, INC. by mailing the document electronically to the duly authorized legal representatives of defendants as follows:

**Counsel for Defendant Vulcan Materials Company:**

Joseph D. Larson, Esquire
Wachtell, Lipton, Rosen & Katz LLP
51 West 52nd Street
New York, New York  10019
(212) 403-1000
JDLarson@wlrk.com

**Counsel for Defendant Florida Rock Industries, Inc.:**

Laura A. Wilkinson, Esquire
Weil, Gotshal & Manges LLP
1300 I Street, NW, Suite 900
Washington, D.C.  20005
(202) 682-7005
laura.wilkinson@weil.com

Robert W. Wilder, Esquire
United States Department of Justice
Antitrust Division, Litigation II Section
1401 H Street, NW, Suite 3000
Washington, D.C.  20530
(202) 307-6336

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: |
| Plaintiff, | JUDGE: |
| v. | DECK TYPE:  Antitrust |
| VULCAN MATERIALS COMPANY and FLORIDA ROCK INDUSTRIES, INC., | DATE STAMP: |
| Defendants. |  |

## FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on November 13, 2007, and plaintiff and defendants, Vulcan Materials Company ("Vulcan") and Florida Rock Industries, Inc. ("Florida Rock"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. JURISDICTION

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II. DEFINITIONS

As used in this Final Judgment:

A.    "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest some or all of the Divestiture Assets.

B.    "Coarse aggregate" means crushed stone produced at quarries or mines and used for, among other things, road base and the production of ready mix concrete and asphalt.

C.    "Divestiture Assets" means:

    1.    the following quarries and yard:

        a.    the Florida Rock Six Mile quarry, located at 3785 Cave Springs Road, Cedarton, Georgia;

2

b.      the Florida Rock Paulding quarry, located at 112 Quarry Road,

Yorkville, Georgia;

c.      the Florida Rock Tyrone quarry, located at 240 Rockwood Road,

Tyrone, Georgia;

d.      the Vulcan Red Oak quarry, located at 5414 Buffington Road, Red

Oak, Georgia;

e.      the Vulcan quarry under development in Butts County, located on

Greer Dairy Road, Jackson, Georgia;

f.      the Florida Rock interest in Columbus Quarry LLC, which owns

the Columbus quarry, located at 3001 Smith Road, Columbus,

Georgia;

g.      the Florida Rock Jersey Pike quarry, located at 2 Pelican Drive,

Chattanooga, Tennessee;

h.      the Florida Rock Richmond quarry, located at 2100 Deepwater

Terminal Road, Richmond, Virginia (but excluding the Florida

Rock ready mix concrete plant, the real property necessary for the

operation of the plant (provided the conveyance of such property

does not interfere with the operation of the Richmond quarry), and

all other tangible and intangible assets exclusively used in the

plant's operations) and, at the option of the Acquirer, use of the

real property, parking lot, equipment shop, and office building

3

equivalent to that which Florida Rock currently has for its quarry operations; and

i.    the Florida Rock Gilmerton yard, located at 4606 Bainbridge Boulevard, Chesapeake, Virginia (but excluding the Florida Rock ready mix concrete plant, the real property necessary for the operation of the plant (provided the conveyance of such property does not interfere with the operation of the Gilmerton yard), and all other tangible and intangible assets exclusively used in the plant's operations) and, at the option of the Acquirer, use of the real property, parking lot, equipment shop, fuel station, and office building equivalent to that which Florida Rock currently has for its operation of the yard;

2.    all tangible assets used in or for the quarries and yard listed in Paragraphs II(C)(1)(a) through (i), including but not limited to all research and development activities (except for any such research and development activities that are principally devoted to either defendant's operations as a whole and not specifically to the operations of the quarries and yard listed in Paragraphs II(C)(1)(a) through (i), and that are not necessary to the operation of the quarries and yard listed in Paragraphs II(C)(1)(a) through (i)), equipment, tooling and fixed assets, real property (leased or owned), personal property, inventory, coarse aggregate reserves, office furniture, materials, supplies, on- or off-site warehouses or storage facilities relating

4

to the quarries and yard; all licenses, permits, and authorizations issued by any governmental organization relating to the quarries and yard; all contracts, teaming arrangements, agreements, leases (including renewal rights), commitments, certifications, and understandings relating to the quarries and yard, including sales agreements and supply agreements; all customer lists, contracts, accounts, and credit records relating to the quarries and yard; all repair and performance records and all other records relating to the quarries and yard; at the option of the Acquirer or Acquirers, a number of trucks, rail cars, and other vehicles usable at the quarries and yard listed in Paragraphs II(C)(1)(a) through (i) equal to, for each separate type of truck, rail car, or other vehicle, the average number of trucks, rail cars, and other vehicles of that type, owned or controlled by defendants, used at each such quarry or yard per month during the months of operation of the quarry or yard between January 1, 2006 and December 31, 2006 (calculated by averaging the number of trucks, rail cars, and other vehicles of each type, owned or controlled by defendants, that were used at each quarry or yard at any time during each month that the quarry or yard was in operation); and at the option of the Acquirer or Acquirers, a number of barges usable at the quarry and yard listed in Paragraphs II(C)(1)(h) and (i) equal to, for each separate type of barge, the average number of barges of that type, owned or controlled by defendants, used at such quarry or yard per month during the months of operation of the quarry or yard

between January 1, 2006 and December 31, 2006 (calculated by averaging
the number of barges of that type, owned or controlled by defendants, that
were used at such quarry or yard at any time during each month that the
quarry or yard was in operation); and

3.  all intangible assets used in the development, production, servicing,
distribution, and sale of products produced by or in the quarries or stored
in the yard listed in Paragraphs II(C)(1)(a) through (i), including but not
limited to all contractual rights (except for any such contractual rights that
are principally devoted to either defendant's operations as a whole and not
specifically to the operations of the quarries and yard listed in Paragraphs
II(C)(1)(a) through (i), and that are not necessary to the operation of the
quarries and yard listed in Paragraphs II(C)(1)(a) through (i)), patents,
licenses and sub-licenses, intellectual property rights, copyrights,
trademarks, trade names, service marks, service names, technical
information, know-how, trade secrets, drawings, blueprints, designs,
design protocols, specifications for materials, specifications for parts and
devices, safety procedures for the handling of materials and substances,
quality assurance and control procedures, all manuals and technical
information defendants provide to their own employees, customers,
suppliers, agents, or licensees, and all research data (including coarse
aggregate reserve testing information) concerning historic and current
research and development efforts relating to the quarries and yard,

6

including but not limited to designs of experiments and the results of successful and unsuccessful designs and experiments. Notwithstanding anything to the contrary in this Final Judgment, if requested by an Acquirer, and subject to approval by the United States in its sole discretion, defendants shall offer to enter into a transition services agreement with respect to computer software (including dispatch software and management information systems) and related documentation, and design tools and simulation capability.

D.    "Florida Rock" means defendant Florida Rock Industries, Inc., a Florida corporation with its headquarters in Jacksonville, Florida, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

E.    "Vulcan" means defendant Vulcan Materials Company, a New Jersey corporation with its headquarters in Birmingham, Alabama, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

## III. APPLICABILITY

A.    This Final Judgment applies to Vulcan and Florida Rock, as defined above, and all other persons in active concert or participation with Vulcan or Florida Rock who receive actual notice of this Final Judgment by personal service or otherwise.

B.    If, prior to complying with Sections IV and V of this Final Judgment, defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that

include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the acquirers of the assets divested pursuant to this Final Judgment.

## IV. DIVESTITURES

A.      Defendants are ordered and directed, within ninety (90) calendar days after the filing of the Complaint in this matter, or five (5) days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer or Acquirers acceptable to the United States in its sole discretion. The United States, in its sole discretion, may agree to one or more extensions of this time period, not to exceed in total sixty (60) calendar days, and shall notify the Court in each such circumstance. Defendants agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

B.      In accomplishing the divestitures ordered by this Final Judgment, defendants promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. Defendants shall inform any person making inquiry regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Unless the United States otherwise consents in writing, defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client or work-product privileges. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

8

C.      Defendants shall not take any action that will impede in any way any person from competing for or obtaining the lease to the Branscome Chesapeake yard, located at 120 Dominion Boulevard, Chesapeake, Virginia.

D.      Unless the United States otherwise consents in writing, defendants shall provide the Acquirer or Acquirers and the United States information relating to personnel involved in production, operations, development, and sales at the Divestiture Assets to enable the Acquirer or Acquirers to make offers of employment.  Defendants shall not interfere with any negotiations by the Acquirer or Acquirers to employ any employee of the Divestiture Assets whose primary responsibility is production, operations, development, or sales at the Divestiture Assets.

E.      Unless the United States otherwise consents in writing, defendants shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities of the Divestiture Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

F.      With the exception of the Butts County site listed in Paragraph II(C)(1)(e), defendants shall warrant to the Acquirer or Acquirers that each asset will be operational on the date of sale.  Vulcan shall further warrant to the Acquirer that it has obtained all environmental, zoning, or other permits required to produce coarse aggregate at the Vulcan quarry under development in Butts County, identified in Paragraph II(C)(1)(e), and that such permits are transferable to the Acquirer.

9

G.     Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Assets.

H.     Defendants shall warrant to the Acquirer or Acquirers that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Divestiture Assets.  Defendants shall not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Assets.

I.     Unless the United States otherwise consents in writing, any divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer or Acquirers as viable, ongoing businesses engaged in producing and distributing coarse aggregate, that the Divestiture Assets will remain viable, and that the divestiture of such assets will remedy the competitive harm alleged in the Complaint.  The sale of the Divestiture Assets may be made to one or more Acquirers, so long as the Florida Rock Richmond quarry, identified in Paragraph II(C)(1)(h) above, and the Florida Rock Gilmerton yard, identified in Paragraph II(C)(1)(i) above, are divested to a single Acquirer.  The divestitures, whether pursuant to Section IV or Section V of this Final Judgment:

1.     shall be made to an Acquirer or Acquirers that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) to compete effectively in the production, distribution, and sale of coarse aggregate; and

10

2.      shall be accomplished so as to satisfy the United States, in its sole

discretion, that none of the terms of any agreement between an Acquirer or

Acquirers and defendants gives defendants the ability to unreasonably

raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise

to interfere in the ability of the Acquirer to compete effectively in the

production, distribution, and sale of coarse aggregate.

## V. APPOINTMENT OF TRUSTEE TO EFFECT DIVESTITURES

A.      If defendants have not divested the Divestiture Assets within the time period

specified in Paragraph IV(A), defendants shall notify the United States of that fact in writing.

Upon application of the United States, the Court shall appoint a trustee selected by the United

States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.      After the appointment of a trustee becomes effective, only the trustee shall have

the right to sell the Divestiture Assets.  The trustee shall have the power and authority to

accomplish the divestiture to an Acquirer acceptable to the United States at such price and on

such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions

of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court

deems appropriate.  Subject to Paragraph V(D) of this Final Judgment, the trustee may hire at the

cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be

solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the

divestiture.

C.      Defendants shall not object to a sale by the trustee on any ground other than the

trustee's malfeasance.  Any such objection by defendants must be conveyed in writing to the

11

United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D.     The trustee shall serve at the cost and expense of defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.     Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secrets or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F.     After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems

12

confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.      If the trustee has not accomplished the divestitures ordered under this Final Judgment within six months after its appointment, the trustee shall promptly file with the Court a report setting forth: (1) the trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and (3) the trustee's recommendations. To the extent such report contains information that the trustee deems confidential, such report shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States, which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. <u>NOTICE OF PROPOSED DIVESTITURES</u>

A.      Within two (2) business days following execution of a definitive divestiture agreement, defendants or the trustee, whichever is then responsible for effecting the divestiture required herein, shall notify the United States of any proposed divestiture required by Section IV or V of this Final Judgment. If the trustee is responsible, it shall similarly notify defendants. The

notice shall set forth the details of the proposed divestiture and list the name, address, and

telephone number of each person not previously identified who offered or expressed an interest

in or desire to acquire any ownership interest in the Divestiture Assets, together with full details

of the same.

B.     Within fifteen (15) calendar days of receipt by the United States of such notice,

the United States may request from defendant, the proposed Acquirer or Acquirers, any other

third party, or the trustee, if applicable, additional information concerning the proposed

divestiture, the proposed Acquirer or Acquirers, and any other potential Acquirer. Defendants

and the trustee shall furnish any additional information requested within fifteen (15) calendar

days of the receipt of the request, unless the parties shall otherwise agree.

C.     Within thirty (30) calendar days after receipt of the notice, or within twenty (20)

calendar days after the United States has been provided the additional information requested

from defendant, the proposed Acquirer or Acquirers, any third party, or the trustee, whichever is

later, the United States shall provide written notice to defendants and the trustee, if there is one,

stating whether or not it objects to the proposed divestiture. If the United States provides written

notice that it does not object, the divestiture may be consummated, subject only to defendant's

limited right to object to the sale under Paragraph V(C) of this Final Judgment. Absent written

notice that the United States does not object to the proposed Acquirer or upon objection by the

United States, a divestiture proposed under Section IV or Section V shall not be consummated.

Upon objection by defendants under Paragraph V(C), a divestiture proposed under Section V

shall not be consummated unless approved by the Court.

14

## VII. <u>FINANCING</u>

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII. <u>HOLD SEPARATE</u>

Until the divestitures required by this Final Judgment have been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. <u>AFFIDAVITS</u>

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or V, defendants shall deliver to the United States an affidavit as to the fact and manner of their compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to any prospective Acquirer, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to

15

information provided by defendants, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.    Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment.  Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.    Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestitures have been completed.

## X. **COMPLIANCE INSPECTION**

A.    For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

      1.    access during defendants' office hours to inspect and copy, or at the option of the United States, to require defendants to provide hard or electronic copies of, all books, ledgers, accounts, records, data and documents in the

possession, custody, or control of defendants, relating to any matters

contained in this Final Judgment; and

2.     to interview, either informally or on the record, defendants' officers,

employees, or agents, who may have their individual counsel present,

regarding such matters.  The interviews shall be subject to the reasonable

convenience of the interviewee and without restraint or interference by

defendant.

B.     Upon the written request of an authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, defendants shall submit written reports or responses

to written interrogatories, under oath if requested, relating to any of the matters contained in this

Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this section shall

be divulged by the United States to any person other than an authorized representative of the

executive branch of the United States, except in the course of legal proceedings to which the

United States is a party (including grand jury proceedings), or for the purpose of securing

compliance with this Final Judgment, or as otherwise required by law.

D.     If, at the time information or documents are furnished by defendants to the United

States, defendants represent and identify in writing the material in any such information or

documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal

Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to

claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United

States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI. NO REACQUISITION

Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XII. RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII. EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XIV. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States's responses to comments. Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and response to

comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____

                                    Court approval subject to procedures of the Antitrust
                                    Procedures and Penalties Act, 15 U.S.C. § 16.


                                    _____
                                    United States District Judge

19

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CASE NO.: |
| v. | JUDGE: |
| VULCAN MATERIALS COMPANY and | DECK TYPE:  Antitrust |
| FLORIDA ROCK INDUSTRIES, INC., | DATE STAMP: |
| Defendants. | |

## HOLD SEPARATE STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

### I. DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A.      "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest some or all of the Divestiture Assets.

B.      "Coarse aggregate" means crushed stone produced at quarries or mines and used for, among other things, road base and the production of ready mix concrete and asphalt.

C.      "Divestiture Assets" means:

      1.      the following quarries and yard:

          a.      the Florida Rock Six Mile quarry, located at 3785 Cave Springs Road, Cedarton, Georgia;

          b.      the Florida Rock Paulding quarry, located at 112 Quarry Road,

Yorkville, Georgia;

c.    the Florida Rock Tyrone quarry, located at 240 Rockwood Road, Tyrone, Georgia;

d.    the Vulcan Red Oak quarry, located at 5414 Buffington Road, Red Oak, Georgia;

e.    the Vulcan quarry under development in Butts County, located on Greer Dairy Road, Jackson, Georgia;

f.    the Florida Rock interest in Columbus Quarry, LLC, which owns the Columbus quarry, located at 3001 Smith Road, Columbus, Georgia;

g.    the Florida Rock Jersey Pike quarry, located at 2 Pelican Drive, Chattanooga, Tennessee;

h.    the Florida Rock Richmond quarry, located at 2100 Deepwater Terminal Road, Richmond, Virginia (but excluding the Florida Rock ready mix concrete plant, the real property necessary for the operation of the plant (provided the conveyance of such property does not interfere with the operation of the Richmond quarry), and all other tangible and intangible assets exclusively used in the plant's operations) and, at the option of the Acquirer, use of the real property, parking lot, equipment shop, and office building equivalent to that which Florida Rock currently has for its quarry operations; and

2

i.    the Florida Rock Gilmerton yard, located at 4606 Bainbridge

Boulevard, Chesapeake, Virginia (but excluding the Florida Rock

ready mix concrete plant, the real property necessary for the

operation of the plant (provided the conveyance of such property

does not interfere with the operation of the Gilmerton yard), and all

other tangible and intangible assets exclusively used in the plant's

operations) and, at the option of the Acquirer, use of the real

property, parking lot, equipment shop, fuel station, and office

building equivalent to that which Florida Rock currently has for its

operation of the yard;

2.    all tangible assets used in or for the quarries and yard listed in Paragraphs

I(C)(1)(a) through (i), including but not limited to all research and

development activities (except for any such research and development

activities that are principally devoted to either defendant's operations as a

whole and not specifically to the operations of the quarries and yard listed

in Paragraphs I(C)(1)(a) through (i), and that are not necessary to the

operation of the quarries and yard listed in Paragraphs I(C)(1)(a) through

(i)), equipment, tooling and fixed assets, real property (leased or owned),

personal property, inventory, coarse aggregate reserves, office furniture,

materials, supplies, on- or off-site warehouses or storage facilities relating

to the quarries and yard; all licenses, permits, and authorizations issued by

any governmental organization relating to the quarries and yard; all

contracts, teaming arrangements, agreements, leases (including renewal

rights), commitments, certifications, and understandings relating to the

quarries and yard, including sales agreements and supply agreements; all

customer lists, contracts, accounts, and credit records relating to the

quarries and yard; all repair and performance records and all other records

relating to the quarries and yard; at the option of the Acquirer or

Acquirers, a number of trucks, rail cars, and other vehicles usable at the

quarries and yard listed in Paragraphs I(C)(1)(a) through (i) equal to, for

each separate type of truck, rail car, or other vehicle, the average number

of trucks, rail cars, and other vehicles of that type, owned or controlled by

defendants, used at each such quarry or yard per month during the months

of operation of the quarry or yard between January 1, 2006 and December

31, 2006 (calculated by averaging the number of trucks, rail cars, and other

vehicles of each type, owned or controlled by defendants, that were used at

each quarry or yard at any time during each month that the quarry or yard

was in operation); and at the option of the Acquirer or Acquirers, a number

of barges usable at the quarry and yard listed in Paragraphs I(C)(1)(h) and

(i) equal to, for each separate type of barge, the average number of barges

of that type, owned or controlled by defendants, used at such quarry or

yard per month during the months of operation of the quarry or yard

between January 1, 2006 and December 31, 2006 (calculated by averaging

the number of barges of that type, owned or controlled by defendants, that

4

were used at such quarry or yard at any time during each month that the

quarry or yard was in operation); and

3.    all intangible assets used in the development, production, servicing,

distribution, and sale of products produced by or in the quarries or stored

in the yard listed in Paragraphs I(C)(1)(a) through (i), including but not

limited to all contractual rights (except for any such contractual rights that

are principally devoted to either defendant's operations as a whole and not

specifically to the operations of the quarries and yard listed in Paragraphs

I(C)(1)(a) through (i), and that are not necessary to the operation of the

quarries and yard listed in Paragraphs I(C)(1)(a) through (i)), patents,

licenses and sub-licenses, intellectual property rights, copyrights,

trademarks, trade names, service marks, service names, technical

information, know-how, trade secrets, drawings, blueprints, designs,

design protocols, specifications for materials, specifications for parts and

devices, safety procedures for the handling of materials and substances,

quality assurance and control procedures, all manuals and technical

information defendants provide to their own employees, customers,

suppliers, agents, or licensees, and all research data (including coarse

aggregate reserve testing information) concerning historic and current

research and development efforts relating to the quarries and yard,

including but not limited to designs of experiments and the results of

successful and unsuccessful designs and experiments.  Notwithstanding

anything to the contrary in the Final Judgment, if requested by an
Acquirer, and subject to approval by the United States in its sole
discretion, defendants shall offer to enter into a transition services
agreement with respect to computer software (including dispatch software
and management information systems) and related documentation, and
design tools and simulation capability.

D.    "Florida Rock" means defendant Florida Rock Industries, Inc., a Florida
corporation with its headquarters in Jacksonville, Florida, its successors and assigns, and its
subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors,
officers, managers, agents, and employees.

E.    "Vulcan" means defendant Vulcan Materials Company, a New Jersey corporation
with its headquarters in Birmingham, Alabama, its successors and assigns, and its subsidiaries,
divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers,
managers, agents, and employees.

## II. OBJECTIVES

The proposed Final Judgment filed in this case is meant to ensure defendants' prompt
divestiture of the Divestiture Assets, for the purpose of maintaining competition in the
production, distribution, and sale of coarse aggregate in certain areas of Georgia, Tennessee, and
Virginia in order to remedy the effects that the United States alleges would otherwise result from
Vulcan's acquisition of Florida Rock. This Hold Separate Stipulation and Order ensures that,
prior to such divestitures, the Divestiture Assets remain independent, economically viable, and
ongoing business concerns that will remain independent and uninfluenced by Vulcan's

6

acquisition of Florida Rock, and that competition is maintained during the pendency of the ordered divestitures.

### III. JURISDICTION AND VENUE

This Court has jurisdiction over the subject matter of this action and defendants do not object either to the Court's exercise of personal jurisdiction in this case or to the propriety of venue of this action in the United States District Court for the District of Columbia.

### IV. COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

A.     The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. § 16, and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on defendants and by filing that notice with the Court.

B.     Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Hold Separate Stipulation and Order by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an Order of the Court.

C.     Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate Stipulation and Order.

7

D.    This Hold Separate Stipulation and Order shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E.    In the event:  (1) the United States has withdrawn its consent, as provided in Paragraph IV(A); or (2) the proposed Final Judgment is not entered pursuant to this Hold Separate Stipulation and Order, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Hold Separate Stipulation and Order, and the making of this Hold Separate Stipulation and Order shall be without prejudice to any party in this or any other proceeding.

F.    Defendants represent that the divestitures ordered in the proposed Final Judgment can and will be made and that defendants later will raise no claim of mistake, hardship, or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

## V. **HOLD SEPARATE PROVISIONS**

Until the divestitures required by the Final Judgment have been accomplished:

A.    Defendants shall preserve, maintain, and continue to operate the Divestiture Assets as independent, ongoing, economically viable competitive businesses, with management, sales, and operations of such assets held entirely separate, distinct, and apart from those of defendants' other operations.  Vulcan shall not coordinate its production, marketing, or terms of sale of any products with those produced by or sold under any of the Divestiture Assets.  Within twenty (20) days after the entry of this Hold Separate Stipulation and Order, defendants will

8

inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

B.    Defendants shall take all steps necessary to ensure that: (1) the Divestiture Assets will be maintained and operated as independent, ongoing, economically viable, and active competitors in the coarse aggregate business; (2) management of the Divestiture Assets will not be influenced by defendants; and (3) the books, records, competitively sensitive sales, marketing, and pricing information, and decision-making concerning the production, distribution, and sale of products produced by or sold under any of the Divestiture Assets will be kept separate and apart from defendants' other operations.

C.    Defendants shall use all reasonable efforts to maintain and increase the sales and revenues of the products produced by or sold under the Divestiture Assets, and shall maintain at 2007 or previously approved levels for 2008, whichever are higher, all promotional, advertising, sales, technical assistance, marketing, and merchandising support for the Divestiture Assets.

D.    Defendants shall provide sufficient working capital and lines and sources of credit to continue to maintain the Divestiture Assets as economically viable and competitive, ongoing businesses, consistent with the requirements of Paragraphs V(A) and (B).

E.    Defendants shall take all steps necessary to ensure that the Divestiture Assets are fully maintained in operable condition at no less than their current capacity and sales and shall maintain and adhere to normal repair and maintenance schedules for the Divestiture Assets.

F.    Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, pledge, or otherwise dispose of any of the Divestiture Assets.

9

G.     Defendants shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, and income of the Divestiture Assets.

H.     Defendants shall take no action that would jeopardize, delay, or impede the sale of the Divestiture Assets.

I.     Defendants' employees involved in production, operations, distribution, and sales at the Divestiture Assets shall not be transferred or reassigned to other areas within the company except for transfer bids initiated by employees pursuant to defendants' regular, established job posting policy.  Defendants shall provide the United States with ten (10) calendar days notice of such transfer.

J.     Defendants shall appoint a person or persons to oversee the Divestiture Assets, and who will be responsible for defendants' compliance with this Section.  This person shall have complete managerial responsibility for the Divestiture Assets, subject to the provisions of the proposed Final Judgment.  In the event such person is unable to perform his duties, defendants shall appoint, subject to the approval of the United States, a replacement within ten (10) working days.  Should defendants fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement.

K.     Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures pursuant to the Final Judgment to an Acquirer or Acquirers acceptable to the United States.

10

L.    This Hold Separate Stipulation and Order shall remain in effect until: (1) the

consummation of the divestitures required by the proposed Final Judgment; (2) further order of

the Court; or (3) the United States' voluntary dismissal of the Complaint in this matter.

Dated: November 13, 2007

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:

_Robert W. Wilder_ (signature)

Robert W. Wilder, Esquire
United States Department of Justice
Antitrust Division, Litigation II Section
1401 H Street, NW, Suite 3000
Washington, D.C. 20530
(202) 307-6336

FOR DEFENDANT
VULCAN MATERIALS COMPANY:

(signature)

Joseph D. Larson, Esquire
Wachtell, Lipton, Rosen & Katz LLP
51 West 52nd Street
New York, New York 10019
(212) 403-1000

FOR DEFENDANT
FLORIDA ROCK INDUSTRIES, INC.

_Laura Wilkinson_ (signature)

Laura A. Wilkinson, Esquire
Weil, Gotshal & Manges LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
(202) 682-7000
District of Columbia Bar Number 413497

ORDER

IT IS SO ORDERED by the Court, this _____ day of _____, 2007.

_____
United States District Judge

11