**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>VULCAN MATERIALS COMPANY and<br>FLORIDA ROCK INDUSTRIES, INC.,<br><br>    Defendants. | CASE NO.:<br><br>JUDGE:<br><br>DECK TYPE:  Antitrust<br><br>DATE STAMP: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

I.

## NATURE AND PURPOSE OF THE PROCEEDING

The United States filed a civil antitrust Complaint on November 13, 2007, seeking to

enjoin the proposed acquisition by Vulcan Materials Company ("Vulcan") of Florida Rock

Industries, Inc. ("Florida Rock").  The Complaint alleges that the likely effect of this acquisition

would be to lessen competition substantially in the production, distribution, and sale of coarse

aggregate in certain areas of Georgia, Tennessee and Virginia, in violation of Section 7 of the

Clayton Act, 15 U.S.C. § 18.  This loss of competition likely would result in higher prices for

coarse aggregate in the affected areas.

At the same time the Complaint was filed, the United States also filed a Hold Separate

Stipulation and Order and a proposed Final Judgment, which were designed to eliminate the

anticompetitive effects of the acquisition.  Under the proposed Final Judgment, which is

explained more fully below, Vulcan and Florida Rock are required to divest single coarse

aggregate quarries in Chattanooga, Tennessee, Columbus, Georgia, and Richmond, Virginia; four

quarries and one site that is being developed for use as a quarry in the western and southern parts

of the Atlanta area; and a distribution yard in Chesapeake, Virginia.  Until the divestitures

required by the Final Judgment have been accomplished, the Hold Separate Stipulation and

Order requires Vulcan and Florida Rock to preserve, maintain, and continue to operate the plants

discussed above (hereafter "Divestiture Assets") as independent, ongoing, economically viable

competitive businesses held entirely separate, distinct, and apart from those of defendants' other

operations.

The United States, Vulcan, and Florida Rock have stipulated that the proposed Final

Judgment may be entered after compliance with the APPA.  Entry of the proposed Final

Judgment would terminate this action, except that the Court would retain jurisdiction to construe,

modify, or enforce the provisions of the proposed Final Judgment and to punish violations

thereof.

II.

DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

A.    The Defendants and the Proposed Transaction

Vulcan is a New Jersey corporation with its principal place of business in Birmingham,

Alabama.  It is the nation's largest producer of construction aggregates, and is also a major

provider of other construction materials and related services.  In 2006, Vulcan shipped

2

approximately 255 million tons of construction aggregates—the majority of which were coarse aggregate—to customers in 21 states, the District of Columbia, and Mexico. Its 2006 sales were over $3 billion.

Florida Rock is a Florida corporation with its principal place of business in Jacksonville, Florida. It produces, distributes, and sells, among other products, construction aggregates, ready mix concrete, prestressed concrete, and cement. Its sales are concentrated in the southeastern and mid-Atlantic states. In 2006, Florida Rock shipped approximately 45 million tons of construction aggregates, a majority of which were coarse aggregate, and reported total sales of approximately $1.4 billion.

On February 19, 2007, Vulcan and Florida Rock entered into an agreement for Vulcan to acquire Florida Rock in a cash-and-stock transaction valued at approximately $4.6 billion.

B.    *The Competitive Effects of the Transaction on the Market for Coarse Aggregate*

1.    *Relevant Product Market*

The Complaint alleges that the production, distribution, and sale of coarse aggregate is a relevant product market within the meaning of Section 7 of the Clayton Act. Coarse aggregate is a type of construction aggregates, and includes crushed stone of varying sizes produced at quarries or mines.[1] Among other things, it is used as base material for roads and other construction sites and for the production of ready mix concrete and asphalt. Different sizes of coarse aggregate are needed to meet different project specifications.

---

[1] Construction aggregates include crushed stone, gravel, sand, recycled asphalt, and recycled concrete.

3

There are no reliable substitutes for coarse aggregate because it differs from other products in its physical composition, functional characteristics, customary uses, consistent availability, and pricing. To the extent that any substitutes exist, most customers already use these to the full extent possible in light of the limits on their availability and the amounts that can be used in a given product, and cannot use more of them in place of coarse aggregate in response to an increase in the price of coarse aggregate. The Complaint alleges that a small but significant post-acquisition increase in the price of coarse aggregate would not cause its purchasers to substitute another product in sufficient quantities so as to make such a price increase unprofitable. Accordingly, the production, distribution, and sale of coarse aggregate is a relevant product market.

2.    *Relevant Geographic Markets*

Coarse aggregate is a bulky, heavy, and relatively low-value product. In some markets, coarse aggregate is delivered to customers exclusively by truck. In other markets, the lack of native coarse aggregate sources and the availability of rail and/or navigable waterways makes it economical to rail, barge, and/or ship coarse aggregate directly to customer plants or job sites, or, much more frequently, to a distribution yard from which it is picked up by truck and delivered to the end customer. The cost of transporting coarse aggregate is high compared to its value, which limits the distance it can be economically transported from a quarry or distribution yard to a ready mix concrete or asphalt plant or job site. Transportation costs, as well as the location of competitors relative to a customer's plant or job site, thus limit the geographic area within which a coarse aggregate supplier can effectively compete.

The Complaint alleges that there are a number of geographic areas that constitute geographic markets in which the proposed acquisition by Vulcan of Florida Rock will harm

4

competition in the production, distribution, and sale of coarse aggregate. As discussed below, in each of these geographic markets, Vulcan and Florida Rock quarries face limited competition from other suppliers in the delivery of coarse aggregate to customers in the market and, because of transportation costs, a small but significant post-acquisition increase in the price of coarse aggregate would not cause customers to procure coarse aggregate from quarries farther away.

### a. Northwest Atlanta

Florida Rock owns and operates a coarse aggregate quarry located in Cedarton, Georgia, known as the Six Mile quarry. This quarry serves a geographic area that includes, among other areas, all or part of Floyd, Polk, Haralson, and Bartow Counties in Georgia (hereafter referred to as "Northwest Atlanta"). Customers with plants or jobs within Northwest Atlanta may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Adairsville, Bartow, and Rockmart quarries and from another competitor's quarry located in Cartersville, Georgia.

### b. West Atlanta

Florida Rock owns and operates a coarse aggregate quarry located in Yorkville, Georgia, known as the Paulding quarry. This quarry serves a geographic area that includes, among other areas, all or part of Paulding, Douglas, Carroll, Haralson, Polk, and Cobb Counties in Georgia (hereafter referred to as "West Atlanta"). Customers with plants or jobs within West Atlanta may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Villa Rica, Kennesaw, and Lithia Springs quarries and from the quarries of other competitors located in Dallas, Georgia, and Douglasville, Georgia.

5

### c. Southwest Atlanta

Florida Rock owns and operates a coarse aggregate quarry located in Tyrone, Georgia, known as the Tyrone quarry. This quarry serves a geographic area that includes, among other areas, all or part of Fulton, Coweta, Fayette, and Clayton Counties in Georgia (hereafter referred to as "Southwest Atlanta"). Customers with plants or jobs within Southwest Atlanta may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Madras quarry and from another competitor's quarry located in Tyrone, Georgia.

### d. South Atlanta

Florida Rock owns and operates a coarse aggregate quarry located in Riverdale, Georgia, known as the Forest Park quarry. This quarry serves a geographic area that includes, among other areas, all or part of Fulton, Clayton, Henry, DeKalb, and Fayette Counties in Georgia (hereafter referred to as "South Atlanta"). Customers with plants or jobs within South Atlanta may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Red Oak quarry and from another competitor's quarry located in College Park, Georgia.

### e. Southeast Atlanta

Florida Rock owns and operates a coarse aggregate quarry located in Zotella, Georgia, known as the Griffin quarry. This quarry serves a geographic area that includes, among other areas, all or part of Spalding and Henry Counties in Georgia (hereafter referred to as "Southeast Atlanta"). Customers with plants or jobs within Southeast Atlanta may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Stockbridge quarry. In addition, Vulcan is in the process of opening a new quarry in Butts

6

County, Georgia, expected to be operational in 2008, from which it plans to serve, among other areas, customers in all or part of Southeast Atlanta.

### f. Columbus

Florida Rock owns a majority interest in a company that owns and operates a coarse aggregate quarry located in Columbus, Georgia, known as the Columbus quarry. This quarry serves a geographic area that includes, among other areas, all or part of Muscogee and Harris Counties in Georgia (hereafter referred to as "Columbus"). Customers with plants or jobs within Columbus may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Barin quarry and from another competitor's quarry located in Midland, Georgia.

### g. Chattanooga

Florida Rock owns and operates a coarse aggregate quarry located in Chattanooga, Tennessee, known as the Jersey Pike quarry. This quarry serves a geographic area that includes, among other areas, all or part of Hamilton County in Tennessee (hereafter referred to as "Chattanooga"). Customers with plants or jobs within Chattanooga may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan's Chattanooga quarry and from another competitor's quarries located in Chattanooga, Tennessee, and Ringgold, Georgia.

### h. South Hampton Roads

Florida Rock owns and operates a coarse aggregate quarry located in Richmond, Virginia, known as the Richmond quarry, a coarse aggregate quarry located in Havre de Grace, Maryland, known as the Havre de Grace quarry, and a barge-served distribution yard located in Chesapeake, Virginia, known as the Gilmerton yard. Florida Rock also operates a distribution yard owned by

7

a third party located in Chesapeake, Virginia. Via these distribution yards, Florida Rock serves a geographic area that includes, among other areas, all or part of the cities of Norfolk, Suffolk, Portsmouth, Chesapeake, and Virginia Beach in Virginia (hereafter referred to as "South Hampton Roads"). Customers with plants or jobs within South Hampton Roads may, depending on the location of their plant or job sites, also economically procure coarse aggregate from Vulcan rail and barge terminals supplied by Vulcan's Richmond, Lawrenceville, and Skippers quarries. Other quarries cannot on a regular basis compete successfully for customers with plants or jobs in South Hampton Roads because they do not have appropriate distribution facilities in the area and/or quarries similarly proximate to rail lines or navigable water sources.

### 3.    Anticompetitive Effects of the Acquisition

In each relevant geographic area, the proposed acquisition will eliminate the competition between Vulcan and Florida Rock and substantially increase market concentration. In Southeast Atlanta and South Hampton Roads, it will reduce the number of suppliers of most specifications of coarse aggregate from two to one. In Northwest Atlanta, Southwest Atlanta, South Atlanta, Columbus, and Chattanooga, the proposed acquisition will reduce the number of coarse aggregate suppliers from three to two generally, and for some customers and projects, will reduce the number from two to one. In West Atlanta, the proposed acquisition will reduce the number of coarse aggregate suppliers from four to three generally, and for some customers and projects, will reduce the number from three to two

The proposed acquisition will substantially increase the likelihood that Vulcan will unilaterally increase the price of coarse aggregate to a significant number of customers in all of the relevant geographic areas. The response of other coarse aggregate suppliers in the relevant geographic markets would not be sufficient to constrain a unilateral exercise of market power by

Vulcan after the acquisition because those suppliers likely would not have sufficient capacity and/or incentives to increase production and sales enough to defeat an anticompetitive price increase by Vulcan. State permits and county zoning restrictions in many cases limit quarries' hours of operation and/or production levels, and many coarse aggregate suppliers face practical limitations on the amount of truck traffic their facilities can handle. Moreover, because coarse aggregate mined from quarries is a depletable natural resource and every quarry has finite reserves, every sale by a supplier today represents a tradeoff against future sales.

Likewise, the response of customers would be insufficient to constrain a unilateral exercise of market power by Vulcan. To the extent that cost-effective substitutes exist, these already are being used to the full extent possible, and customers would not increase their use of these substitutes in response to an increase in the price of coarse aggregate. Thus, customers would not be able to prevent Vulcan's exercise of market power.

In addition, and notwithstanding competitor responses, post-acquisition Vulcan will be able to increase prices to those customers that have plants or job sites for which both a Vulcan quarry and a Florida Rock quarry are closer than any other quarries producing coarse aggregate meeting their specifications. Coarse aggregate suppliers know the locations of their competitors' quarries and the distance from their own quarries and their competitors' quarries to a customer's plant or job site. Generally, because of transportation costs, the farther a supplier's closest competitor is from a job site, the less price competition that supplier faces for that project. Post-acquisition, in instances where Vulcan and Florida Rock quarries would be the closest quarries to a customer's plant or project and the next closest coarse aggregate supplier's plant is farther from the customer's plant or project, the combined firm, using the knowledge of its competitors' quarry locations, would be able to charge such customers higher prices.

9

Further, the proposed acquisition is likely to facilitate anticompetitive coordination among the remaining coarse aggregate suppliers in Northwest Atlanta, West Atlanta, Southwest Atlanta, South Atlanta, Columbus, and Chattanooga. Coarse aggregate is homogeneous and suppliers have access to information about competitors' output, capacity, and costs. Given these market conditions, eliminating Florida Rock as one of the few coarse aggregate competitors is likely to further increase the ability of the remaining competitors to coordinate successfully.

Finally, timely and successful entry into the production, distribution, and sale of coarse aggregate is unlikely in any of the geographic areas and thus will not defeat anticompetitive unilateral or coordinated price increases resulting from the proposed acquisition. Securing the proper site for a coarse aggregate quarry or mine is difficult, time-consuming, and costly; it requires the investigation and extensive testing of candidate sites to find ones with adequate reserves of sufficient quality, and can require negotiations with multiple landowners as well as with government officials. Additional difficulties face a new entrant seeking to provide coarse aggregate to South Hampton Roads. In South Hampton Roads, the area's geology is such that coarse aggregate for most applications must be imported from outside the area. For an entrant to compete effectively in South Hampton Roads with Vulcan post-acquisition, that entrant must pair a new or existing rail- or water-served quarry with a distribution yard in South Hampton Roads that is capable of receiving coarse aggregate from such a quarry. Rail- or water-served quarries situated to compete effectively in South Hampton Roads, and the proper sites for distribution yards to serve such quarries, are scarce. In all of the relevant geographic markets the location of a quarry or yard is important due to the high cost of transporting coarse aggregate, but there are very few sites, especially in metropolitan areas, on which to locate coarse aggregate operations.

Obtaining necessary zoning variances and government permits for a coarse aggregate quarry can also be difficult, time-consuming, and costly. In metropolitan areas, land of the necessary size and geology is often already utilized or does not have the appropriate zoning, and obtaining zoning variances can be extremely difficult. Attempts to open a new coarse aggregate quarry or mine, especially in metropolitan areas (such as West Atlanta, Southwest Atlanta, South Atlanta, Columbus, Chattanooga, and South Hampton Roads) but also frequently in rural areas, often face fierce public opposition, which delays and raises the expense of opening such operations or prevents such projects altogether. In addition, state and federal water, air quality, and other permitting process requirements must be met, which can take from months to years.

Finally, even after a quarry or mine site is selected, acquired, and properly zoned and permitted, the owner must spend significant time and resources to prepare the land and install the equipment necessary to run the operation. As a result of all of these costly and time-consuming barriers to entry, entry by any other firm into the coarse aggregate market in the relevant geographic areas will not be timely, likely, or sufficient to defeat an anticompetitive price increase.

III.

EXPLANATION OF THE PROPOSED FINAL JUDGMENT

A.    *The Divestiture Assets*

The divestitures provided for in the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in the markets for the production, distribution, and sale of coarse aggregate in all of the relevant geographic markets. In each market, the divestitures will establish a new, independent, and economically viable competitor.

11

The Divestiture Assets include the following quarries and yard:

a.      the Florida Rock Six Mile quarry, located at 3785 Cave Springs Road, Cedarton,

        Georgia, divestiture of which will remedy the competitive concerns in Northwest

        Atlanta;

b.      the Florida Rock Paulding quarry, located at 112 Quarry Road, Yorkville,

        Georgia, divestiture of which will remedy the competitive concerns in West

        Atlanta;

c.      the Florida Rock Tyrone quarry, located at 240 Rockwood Road, Tyrone, Georgia,

        divestiture of which will remedy the competitive concerns in Southwest Atlanta;

d.      the Vulcan Red Oak quarry, located at 5414 Buffington Road, Red Oak, Georgia,

        divestiture of which will remedy the competitive concerns in South Atlanta;

e.      the Vulcan quarry under development in Butts County, located on Greer Dairy

        Road, Jackson, Georgia, divestiture of which will remedy the competitive

        concerns in Southeast Atlanta;

f.      the Florida Rock interest in Columbus Quarry LLC, which owns the Columbus

        quarry, located at 3001 Smith Road, Columbus, Georgia, divestiture of which will

        remedy the competitive concerns in Columbus;

g.      the Florida Rock Jersey Pike quarry, located at 2 Pelican Drive, Chattanooga,

        Tennessee, divestiture of which will remedy the competitive concerns in

        Chattanooga;

h.      the Florida Rock Richmond quarry located at 2100 Deepwater Terminal Road,

        Richmond, Virginia (but excluding the Florida Rock ready mix concrete plant, the

        real property necessary for the operation of the plant (provided the conveyance of

such property does not interfere with the operation of the Richmond quarry), and all other tangible and intangible assets exclusively used in the plant's operations) and, at the option of the Acquirer, use of the real property, parking lot, equipment shop, and office building equivalent to that which Florida Rock currently has for its quarry operations, divestiture of which (in addition to the yard listed in Paragraph (i)) will remedy the competitive concerns in South Hampton Roads; and

i.      in South Hampton Roads, the Florida Rock Gilmerton yard, located at 4606 Bainbridge Boulevard, Chesapeake, Virginia (but excluding the Florida Rock ready mix concrete plant, the real property necessary for the operation of the plant (provided the conveyance of such property does not interfere with the operation of the Gilmerton yard), and all other tangible and intangible assets exclusively used in the plant's operations) and, at the option of the Acquirer, use of the real property, parking lot, equipment shop, fuel station, and office building equivalent to that which Florida Rock currently has for its operation of the yard, divestiture of which (in addition to the quarry listed in Paragraph (h)) will remedy the competitive concerns in South Hampton Roads.

The proposed merger does not raise competitive concerns with respect to the sale of ready mix concrete in either Richmond or South Hampton Roads. Thus, parts (h) and (i) of the Divestiture Assets definition above excludes property related to Florida Rock's ready mix concrete operations located at the Richmond quarry and Gilmerton yard properties that is not necessary to the operation of the quarry and coarse aggregate yard, and specifically grant back to

the Acquirer the right to use real property and facilities that are currently used by both the coarse aggregate and the ready mix operations.

The Divestiture Assets also include all tangible assets used in or for the above-listed quarries and yard as well as all intangible assets used in the development, production, servicing, distribution, and sale of products produced by or in the quarries or stored in the yard.

The sale of the Divestiture Assets according to the terms of the proposed Final Judgment will ensure that Vulcan's acquisition of Florida Rock does not harm competition in any of the affected geographic areas.

B.    *Selected Provisions of the Proposed Final Judgment*

In antitrust cases involving mergers in which the United States seeks a divestiture remedy, it requires completion of the divestiture within the shortest time period reasonable under the circumstances. A quick divestiture has the benefits of restoring competition lost in the acquisition and reducing the possibility of dissipation of the value of the assets. Paragraph IV(A) of the proposed Final Judgment requires Defendants to divest the Divestiture Assets as viable ongoing businesses within 90 days after the filing of the Complaint in this matter or five days after notice of the entry of the Final Judgment by the Court, whichever is later.[2]

Paragraph IV(D) provides that Defendants shall not impede in any way any person from competing for or obtaining the lease to the Branscome Chesapeake yard. This yard is owned by a contractor who leases it to other companies. Currently, the lessee is Florida Rock, which barges coarse aggregate to the yard to supply the owner's operations. The lease with Florida Rock expires on December 31, 2007. Paragraph IV(D) is designed to ensure that the buyer of the

_____

[2] The Final Judgment also provides that this 90-day time period may be extended by the United States in its sole discretion for a total period not exceeding 60 calendar days, and that the Court will receive prior notice of any such extension.

Florida Rock Richmond quarry and Florida Rock Gilmerton yard divestiture assets, or any other interested party, has the opportunity to compete for the lease upon its expiration.

The Vulcan quarry under development in Butts County is not yet operational, but Paragraph IV(F) requires Defendants to warrant to the Acquirer that they have obtained all environmental, zoning, or other permits required to begin production of coarse aggregate at the Butts site.

Paragraph IV(J) of the proposed Final Judgment provides that the sale of the Divestiture Assets may be made to one or more Acquirers, except that the Richmond quarry and Gilmerton yard must be divested to a single acquirer. This provision ensures that the owner of the barge-served quarry also owns a barge-served distribution facility in South Hampton Roads so that it can compete effectively in South Hampton Roads.

Paragraph IV(J) of the proposed Final Judgment also provides that the assets must be divested in such a way as to satisfy the United States in its sole discretion that the operations can and will be operated by the purchaser as a viable, ongoing business that can compete effectively in the relevant markets. The provisions of Paragraph IV are designed to ensure that Defendants take all reasonable steps necessary to accomplish the divestitures quickly and cooperate with prospective purchasers.

Finally, Paragraph V of the proposed Final Judgment provides that in the event that Defendants do not accomplish the divestitures within the periods prescribed in the proposed Final Judgment, the Court will appoint a trustee selected by the United States to effect the divestitures. If a trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to

15

provide an incentive for the trustee based on the price obtained and the speed with which the divestitures are accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestitures. If the divestitures have not been accomplished at the end of six months, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

IV.

## REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against Defendants.

V.

## PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Maribeth Petrizzi
> Chief, Litigation II Section
> Antitrust Division
> United States Department of Justice
> 1401 H St. N.W., Suite 3000
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

VI.

## ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Vulcan's acquisition of Florida

Rock. The United States is satisfied, however, that the divestiture of assets described in the

proposed Final Judgment will preserve competition in the production, distribution, and sale of

coarse aggregate in the relevant geographic markets identified by the United States. Thus, the

proposed Final Judgment would achieve all or substantially all of the relief the United States

would have obtained through litigation, but avoids the time, expense, and uncertainty of a full

trial on the merits of the Complaint.

VII.

STANDARD OF REVIEW UNDER THE APPA<br>FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in

antitrust cases brought by the United States be subject to a sixty-day comment period, after

which the Court shall determine whether entry of the proposed Final Judgment "is in the public

interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the

statute as amended in 2004, is required to consider:

> (A)   the competitive impact of such judgment, including termination of
> alleged violations, provisions for enforcement and modification, duration
> of relief sought, anticipated effects of alternative remedies actually
> considered, whether its terms are ambiguous, and any other competitive
> considerations bearing upon the adequacy of such judgment that the court
> deems necessary to a determination of whether the consent judgment is in
> the public interest; and
>
> (B)   the impact of entry of such judgment upon competition in the
> relevant market or markets, upon the public generally and individuals
> alleging specific injury from the violations set forth in the complaint
> including consideration of the public benefit, if any, to be derived from a
> determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A)-(B); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp.

2d 1, 11 (D.D.C. 2007) (concluding that the 2004 amendments "effected minimal changes" to

18

scope of review under Tunney Act, leaving review "sharply proscribed by precedent and the nature of Tunney Act proceedings").[3]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995). With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

---

[3] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006).

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[4]  In making its public interest

determination, a district court "must accord deference to the government's predictions about the

efficacy of its remedies, and may not require that the remedies perfectly match the alleged

violations because this may only reflect underlying weakness in the government's case or

concessions made during negotiation." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also*

*Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's

predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-*

*Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due

respect to the United States' prediction as to the effect of proposed remedies, its perception of

the market structure, and its views of the nature of the case).

Court approval of a consent decree requires a standard more flexible and less strict than

that appropriate to court adoption of a litigated decree following a finding of liability.  "[A]

proposed decree must be approved even if it falls short of the remedy the court would impose

on its own, as long as it falls within the range of acceptability or is 'within the reaches of public

interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations

omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd*

*sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan*

---

[4] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

*Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). This instruction explicitly writes into the statute the standard intended by the Congress that enacted the Tunney Act in 1974, as Senator Tunney then explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the

21

benefits of prompt and less costly settlement through the consent decree process." 119 Cong.

Rec. 24,598 (1973) (statement of Senator Tunney).  Rather, the procedure for the public

interest determination is left to the discretion of the court, with the recognition that the court's

"scope of review remains sharply proscribed by precedent and the nature of Tunney Act

proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[5]

VIII.

## DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that

were considered by the United States in formulating the proposed Final Judgment.

Dated: November 13, 2007

Respectfully submitted,

Robert W. Wilder, Esquire
United States Department of Justice
Antitrust Division, Litigation II Section
1401 H Street, NW, Suite 3000
Washington, DC 20530
(202) 307-6336

---

[5] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973)("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").