# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE: 1:07-cv-02044 |
| Plaintiff, | JUDGE: Sullivan, Emmet G. |
| v. | DECK TYPE:  Antitrust |
| VULCAN MATERIALS COMPANY and FLORIDA ROCK INDUSTRIES, INC., | DATE STAMP: |
| Defendants. | |

## MOTION AND MEMORANDUM OF
## THE UNITED STATES IN SUPPORT OF ENTRY OF FINAL JUDGMENT

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C.

§ 16(b)-(h) ("APPA" or "Tunney Act"), the United States moves for entry of the proposed Final

Judgment (attached as Exhibit A) filed in this civil antitrust case.  Defendants Vulcan Materials

Company ("Vulcan") and Florida Rock Industries, Inc. ("Florida Rock") have stipulated to the

entry of the proposed Final Judgment upon compliance with the APPA and do not object to entry

of this proposed Final Judgment without a hearing.  The Competitive Impact Statement ("CIS"),

filed by the United States on November 13, 2007, explains why entry of the proposed Final

Judgment is in the public interest.  The United States is filing with this motion a Certificate of

Compliance (attached as Exhibit B) setting forth the steps taken by the parties to comply with all

applicable provisions of the APPA and certifying that the statutory waiting periods have expired.

Thus, the proposed Final Judgment may be entered at this time without further hearing if the

Court determines that entry is in the public interest.  Entry of the proposed Final Judgment would

terminate this action, except that the Court would retain jurisdiction to construe, modify, or

enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## I.     BACKGROUND

### A.     Pre-Complaint Investigation

On February 19, 2007, Vulcan and Florida Rock entered into an agreement for Vulcan to

acquire Florida Rock in a cash-and-stock transaction.  For the next nine months, the United

States Department of Justice ("Department") conducted an extensive, detailed investigation into

the competitive effects of the Vulcan/Florida Rock transaction.  As part of this investigation, the

Department obtained substantial documents and information from the merging parties and issued

six Civil Investigative Demands to third parties.  The Department received and considered more

than 130 boxes of hard copy material and over 280,000 electronic files.  More than 130

interviews were conducted with customers, competitors, and other individuals with knowledge of

the industry.  The investigative staff carefully analyzed the information provided and thoroughly

considered all of the issues presented.  The Department considered the potential competitive

effects of the transaction on coarse aggregate sold in a number of different geographic areas,

obtaining information about this product and these areas from customers, competitors, and other

knowledgeable parties.  The Department concluded that the combination of Vulcan and Florida

Rock likely would lessen competition in the production, distribution, and sale of coarse aggregate

in eight different geographic markets.

Coarse aggregate is crushed stone produced at quarries and used for such things as road

base and the production of ready mix concrete and asphalt.  There are no reliable substitutes for

coarse aggregate, and to the extent that any substitutes exist they are already being used by

customers to the fullest extent possible, and their use cannot be increased in response to an

increase in the price of coarse aggregate.  A small but significant increase in price would not

2

likely cause coarse aggregate consumers to switch products or otherwise reduce their usage of coarse aggregate so as to make the price increase unprofitable.

The eight separate geographic markets in which Vulcan's acquisition of Florida Rock would lessen competition substantially are: Northwest Atlanta, West Atlanta, Southwest Atlanta, South Atlanta, Southeast Atlanta, and Columbus, Georgia; Chattanooga, Tennessee; and South Hampton Roads, Virginia. In each market, certain Vulcan and Florida Rock quarries competed with each other, and usually also with one or two other companies, to serve customers in that market, and customers with plants or jobs within that market were not able to turn to other suppliers because their quarries were too far away and their hauling costs were too great.

As explained more fully in the Complaint and CIS, the acquisition of Florida Rock by Vulcan would have substantially increased concentration and lessened competition in the production, distribution, and sale of coarse aggregate in each of the eight affected geographic markets. In the affected markets, the acquisition would have reduced the number of suppliers from four to three, from three to two, or from two to one; would have eliminated competition between Vulcan and Florida Rock; and would have increased the likelihood that Vulcan would unilaterally increase the price of coarse aggregate to a significant number of customers. In certain markets, the acquisition also would have facilitated coordination among the remaining coarse aggregate suppliers. In every affected market, it was likely that the acquisition would lead to higher prices. Therefore, the Department filed its Complaint alleging competitive harm in the coarse aggregate product market in each of the eight affected geographic markets, and sought a remedy that would ensure that such harm is prevented.

**B.    The Proposed Final Judgment and Post-Complaint Investigation**

On November 13, 2007, the United States filed its Complaint in this matter alleging that

the proposed acquisition of Florida Rock by Vulcan would violate Section 7 of the Clayton Act,

15 U.S.C. § 18.  Simultaneously with the filing of the Complaint, the United States filed a

proposed Final Judgment and a Hold Separate Stipulation and Order signed by plaintiff and

defendants, consenting to the entry of the proposed Final Judgment after compliance with the

requirements of the Tunney Act.  Pursuant to those requirements, the United States also filed its

CIS.

The proposed Final Judgment in this case is designed to preserve competition in the

production, distribution, and sale of coarse aggregate in each of the eight affected geographic

markets.  The proposed Final Judgment requires the divestiture of sufficient assets to prevent the

increase in concentration that resulted from the combination of Vulcan and Florida Rock in each

affected market.  For each of the eight affected geographic markets, the proposed Final Judgment

requires the divestiture of a quarry serving that market, and in the case of South Hampton Roads

also requires the divestiture of one distribution yard.

## II.    COMPLIANCE WITH THE APPA

The APPA requires a sixty-day period for the submission of public comments on a

proposed Final Judgment. *See* 15 U.S.C. § 16(b).  In compliance with the APPA, the United

States filed the CIS on November 13, 2007; published the proposed Final Judgment and CIS in

the *Federal Register* on December 4, 2007 (*see United States v. Vulcan Materials Co. and

Florida Rock Indus., Inc.,* 72 Fed. Reg. 68189); and published summaries of the terms of the

proposed Final Judgment and CIS, together with directions for the submission of written

4

comments relating to the proposed Final Judgment, in *The Washington Post* for seven days beginning on December 16, 2007 and ending on December 22, 2007.

The sixty-day period for public comments ended on February 20, 2008. The Division received only one comment; the Response to that comment was filed with the Court on March 19, 2008 and published in the *Federal Register* on April 4, 2008. As recited in the Certificate of Compliance, all the requirements of the APPA now have been satisfied. It is therefore appropriate for the Court to make the public interest determination required by 15 U.S.C. § 16(e) and to enter the Final Judgment.

## III.    STANDARD FOR JUDICIAL REVIEW UNDER THE APPA

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004,[1] is required to consider:

> (A)     the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

---

[1] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 11 (D.D.C. 2007) (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

> (B)    the impact of entry of such judgment upon competition in the relevant
> market or markets, upon the public generally and individuals alleging specific
> injury from the violations set forth in the complaint including consideration of the
> public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A)-(B).  In considering these statutory factors, the court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp.

2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).

As the United States Court of Appeals for the District of Columbia Circuit has held,

under the APPA a court considers, among other things, the relationship between the remedy

secured and the specific allegations set forth in the government's complaint, whether the decree

is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may

positively harm third parties.  *See Microsoft*, 56 F.3d at 1458-62.  With respect to the adequacy

of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what

relief would best serve the public."  *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988)

(citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56

F.3d at 1460-62.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed
> antitrust consent decree must be left, in the first instance, to the discretion of the
> Attorney General.  The court's role in protecting the public interest is one of
> insuring that the government has not breached its duty to the public in consenting
> to the decree.  The court is required to determine not whether a particular decree is
> the one that will best serve society, but whether the settlement is "*within the
> reaches of the public interest*."  More elaborate requirements might undermine the
> effectiveness of antitrust enforcement by consent decree.

6

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2]  In making its public interest

determination, a district court "must accord deference to the government's predictions about the

efficacy of its remedies, and may not require that the remedies perfectly match the alleged

violations because this may only reflect underlying weakness in the government's case or

concessions made during negotiation." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also*

*Microsoft*, 56 F.3d at 1461 (noting need for courts to be "deferential to the government's

predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland*

*Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the

United States' prediction as to the effect of proposed remedies, its perception of the market

structure, and its views of the nature of the case).

     Courts have greater flexibility in approving proposed consent decrees than in crafting

their own decrees following a finding of liability in a litigated matter.  "[A] proposed decree must

be approved even if it falls short of the remedy the court would impose on its own, as long as it

falls within the range of acceptability or is 'within the reaches of public interest.'" *United States*

*v. AT&T Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F.

Supp. at 716); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky.

1985) (approving the consent decree even though the court would have imposed a greater

---

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983).  *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id*. at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). This instruction explicitly writes into the statute the standard intended by the Congress that enacted the Tunney Act in 1974 , as Senator Tunney then explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest

determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings."

*SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

## IV.   CONCLUSION

For the reasons set forth in this Motion and Memorandum and in the CIS, the United States respectfully requests the Court find that the proposed Final Judgment is in the public interest and enter the Final Judgment without further hearings.

Dated:  April 11, 2008                                  Respectfully submitted,

                                        *Robert W. Wilder / cAH*
                                        Robert W. Wilder
                                        Attorney
                                        United States Department of Justice
                                        Antitrust Division, Litigation II Section
                                        1401 H Street, N.W., Suite 3000
                                        Washington, D.C. 20530
                                        (202) 307-6336

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) 61,508, at 71,980 (W.D. Mo. 1977) ("[T]he Court, in making its public interest finding, should . . . carefully consider the explanations of the government in order to determine whether those explanations are reasonable under the circumstances.").

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: |
| Plaintiff, | |
| | JUDGE: |
| v. | |
| | DECK TYPE:  Antitrust |
| VULCAN MATERIALS COMPANY and FLORIDA ROCK INDUSTRIES, INC., | DATE STAMP: |
| Defendants. | |

## FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on November 13, 2007, and plaintiff and defendants, Vulcan Materials Company ("Vulcan") and Florida Rock Industries, Inc. ("Florida Rock"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. **JURISDICTION**

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II. **DEFINITIONS**

As used in this Final Judgment:

A.    "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest some or all of the Divestiture Assets.

B.    "Coarse aggregate" means crushed stone produced at quarries or mines and used for, among other things, road base and the production of ready mix concrete and asphalt.

C.    "Divestiture Assets" means:

1.    the following quarries and yard:

a.    the Florida Rock Six Mile quarry, located at 3785 Cave Springs Road, Cedarton, Georgia;

2

b.    the Florida Rock Paulding quarry, located at 112 Quarry Road,
Yorkville, Georgia;

c.    the Florida Rock Tyrone quarry, located at 240 Rockwood Road,
Tyrone, Georgia;

d.    the Vulcan Red Oak quarry, located at 5414 Buffington Road, Red
Oak, Georgia;

e.    the Vulcan quarry under development in Butts County, located on
Greer Dairy Road, Jackson, Georgia;

f.    the Florida Rock interest in Columbus Quarry LLC, which owns
the Columbus quarry, located at 3001 Smith Road, Columbus,
Georgia;

g.    the Florida Rock Jersey Pike quarry, located at 2 Pelican Drive,
Chattanooga, Tennessee;

h.    the Florida Rock Richmond quarry, located at 2100 Deepwater
Terminal Road, Richmond, Virginia (but excluding the Florida
Rock ready mix concrete plant, the real property necessary for the
operation of the plant (provided the conveyance of such property
does not interfere with the operation of the Richmond quarry), and
all other tangible and intangible assets exclusively used in the
plant's operations) and, at the option of the Acquirer, use of the
real property, parking lot, equipment shop, and office building

3

equivalent to that which Florida Rock currently has for its quarry

operations; and

i.    the Florida Rock Gilmerton yard, located at 4606 Bainbridge

Boulevard, Chesapeake, Virginia (but excluding the Florida Rock

ready mix concrete plant, the real property necessary for the

operation of the plant (provided the conveyance of such property

does not interfere with the operation of the Gilmerton yard), and all

other tangible and intangible assets exclusively used in the plant's

operations) and, at the option of the Acquirer, use of the real

property, parking lot, equipment shop, fuel station, and office

building equivalent to that which Florida Rock currently has for its

operation of the yard;

2.    all tangible assets used in or for the quarries and yard listed in Paragraphs

II(C)(1)(a) through (i), including but not limited to all research and

development activities (except for any such research and development

activities that are principally devoted to either defendant's operations as a

whole and not specifically to the operations of the quarries and yard listed

in Paragraphs II(C)(1)(a) through (i), and that are not necessary to the

operation of the quarries and yard listed in Paragraphs II(C)(1)(a) through

(i)), equipment, tooling and fixed assets, real property (leased or owned),

personal property, inventory, coarse aggregate reserves, office furniture,

materials, supplies, on- or off-site warehouses or storage facilities relating

4

to the quarries and yard; all licenses, permits, and authorizations issued by any governmental organization relating to the quarries and yard; all contracts, teaming arrangements, agreements, leases (including renewal rights), commitments, certifications, and understandings relating to the quarries and yard, including sales agreements and supply agreements; all customer lists, contracts, accounts, and credit records relating to the quarries and yard; all repair and performance records and all other records relating to the quarries and yard; at the option of the Acquirer or Acquirers, a number of trucks, rail cars, and other vehicles usable at the quarries and yard listed in Paragraphs II(C)(1)(a) through (i) equal to, for each separate type of truck, rail car, or other vehicle, the average number of trucks, rail cars, and other vehicles of that type, owned or controlled by defendants, used at each such quarry or yard per month during the months of operation of the quarry or yard between January 1, 2006 and December 31, 2006 (calculated by averaging the number of trucks, rail cars, and other vehicles of each type, owned or controlled by defendants, that were used at each quarry or yard at any time during each month that the quarry or yard was in operation); and at the option of the Acquirer or Acquirers, a number of barges usable at the quarry and yard listed in Paragraphs II(C)(1)(h) and (i) equal to, for each separate type of barge, the average number of barges of that type, owned or controlled by defendants, used at such quarry or yard per month during the months of operation of the quarry or yard

5

between January 1, 2006 and December 31, 2006 (calculated by averaging

the number of barges of that type, owned or controlled by defendants, that

were used at such quarry or yard at any time during each month that the

quarry or yard was in operation); and

3.    all intangible assets used in the development, production, servicing,

distribution, and sale of products produced by or in the quarries or stored

in the yard listed in Paragraphs II(C)(1)(a) through (i), including but not

limited to all contractual rights (except for any such contractual rights that

are principally devoted to either defendant's operations as a whole and not

specifically to the operations of the quarries and yard listed in Paragraphs

II(C)(1)(a) through (i), and that are not necessary to the operation of the

quarries and yard listed in Paragraphs II(C)(1)(a) through (i)), patents,

licenses and sub-licenses, intellectual property rights, copyrights,

trademarks, trade names, service marks, service names, technical

information, know-how, trade secrets, drawings, blueprints, designs,

design protocols, specifications for materials, specifications for parts and

devices, safety procedures for the handling of materials and substances,

quality assurance and control procedures, all manuals and technical

information defendants provide to their own employees, customers,

suppliers, agents, or licensees, and all research data (including coarse

aggregate reserve testing information) concerning historic and current

research and development efforts relating to the quarries and yard,

6

including but not limited to designs of experiments and the results of successful and unsuccessful designs and experiments. Notwithstanding anything to the contrary in this Final Judgment, if requested by an Acquirer, and subject to approval by the United States in its sole discretion, defendants shall offer to enter into a transition services agreement with respect to computer software (including dispatch software and management information systems) and related documentation, and design tools and simulation capability.

D.      "Florida Rock" means defendant Florida Rock Industries, Inc., a Florida corporation with its headquarters in Jacksonville, Florida, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

E.      "Vulcan" means defendant Vulcan Materials Company, a New Jersey corporation with its headquarters in Birmingham, Alabama, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

## III. APPLICABILITY

A.      This Final Judgment applies to Vulcan and Florida Rock, as defined above, and all other persons in active concert or participation with Vulcan or Florida Rock who receive actual notice of this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Sections IV and V of this Final Judgment, defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that

7

include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of

this Final Judgment. Defendants need not obtain such an agreement from the acquirers of the

assets divested pursuant to this Final Judgment.

## IV. **DIVESTITURES**

A.     Defendants are ordered and directed, within ninety (90) calendar days after the

filing of the Complaint in this matter, or five (5) days after notice of the entry of this Final

Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner consistent

with this Final Judgment to an Acquirer or Acquirers acceptable to the United States in its sole

discretion. The United States, in its sole discretion, may agree to one or more extensions of this

time period, not to exceed in total sixty (60) calendar days, and shall notify the Court in each

such circumstance. Defendants agree to use their best efforts to divest the Divestiture Assets as

expeditiously as possible.

B.     In accomplishing the divestitures ordered by this Final Judgment, defendants

promptly shall make known, by usual and customary means, the availability of the Divestiture

Assets. Defendants shall inform any person making inquiry regarding a possible purchase of the

Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that

person with a copy of this Final Judgment. Unless the United States otherwise consents in

writing, defendants shall offer to furnish to all prospective Acquirers, subject to customary

confidentiality assurances, all information and documents relating to the Divestiture Assets

customarily provided in a due diligence process except such information or documents subject to

the attorney-client or work-product privileges. Defendants shall make available such information

to the United States at the same time that such information is made available to any other person.

8

C.     Defendants shall not take any action that will impede in any way any person from competing for or obtaining the lease to the Branscome Chesapeake yard, located at 120 Dominion Boulevard, Chesapeake, Virginia.

D.     Unless the United States otherwise consents in writing, defendants shall provide the Acquirer or Acquirers and the United States information relating to personnel involved in production, operations, development, and sales at the Divestiture Assets to enable the Acquirer or Acquirers to make offers of employment. Defendants shall not interfere with any negotiations by the Acquirer or Acquirers to employ any employee of the Divestiture Assets whose primary responsibility is production, operations, development, or sales at the Divestiture Assets.

E.     Unless the United States otherwise consents in writing, defendants shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities of the Divestiture Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

F.     With the exception of the Butts County site listed in Paragraph II(C)(1)(e), defendants shall warrant to the Acquirer or Acquirers that each asset will be operational on the date of sale. Vulcan shall further warrant to the Acquirer that it has obtained all environmental, zoning, or other permits required to produce coarse aggregate at the Vulcan quarry under development in Butts County, identified in Paragraph II(C)(1)(e), and that such permits are transferable to the Acquirer.

9

G.    Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Assets.

H.    Defendants shall warrant to the Acquirer or Acquirers that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Divestiture Assets. Defendants shall not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Assets.

I.    Unless the United States otherwise consents in writing, any divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer or Acquirers as viable, ongoing businesses engaged in producing and distributing coarse aggregate, that the Divestiture Assets will remain viable, and that the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The sale of the Divestiture Assets may be made to one or more Acquirers, so long as the Florida Rock Richmond quarry, identified in Paragraph II(C)(1)(h) above, and the Florida Rock Gilmerton yard, identified in Paragraph II(C)(1)(i) above, are divested to a single Acquirer. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment:

1.    shall be made to an Acquirer or Acquirers that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) to compete effectively in the production, distribution, and sale of coarse aggregate; and

10

2.    shall be accomplished so as to satisfy the United States, in its sole

discretion, that none of the terms of any agreement between an Acquirer or

Acquirers and defendants gives defendants the ability to unreasonably

raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise

to interfere in the ability of the Acquirer to compete effectively in the

production, distribution, and sale of coarse aggregate.

## V. APPOINTMENT OF TRUSTEE TO EFFECT DIVESTITURES

A.    If defendants have not divested the Divestiture Assets within the time period

specified in Paragraph IV(A), defendants shall notify the United States of that fact in writing.

Upon application of the United States, the Court shall appoint a trustee selected by the United

States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.    After the appointment of a trustee becomes effective, only the trustee shall have

the right to sell the Divestiture Assets. The trustee shall have the power and authority to

accomplish the divestiture to an Acquirer acceptable to the United States at such price and on

such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions

of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court

deems appropriate. Subject to Paragraph V(D) of this Final Judgment, the trustee may hire at the

cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be

solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the

divestiture.

C.    Defendants shall not object to a sale by the trustee on any ground other than the

trustee's malfeasance. Any such objection by defendants must be conveyed in writing to the

11

United States and the trustee within ten (10) calendar days after the trustee has provided the
notice required under Section VI.

D.     The trustee shall serve at the cost and expense of defendants, on such terms and
conditions as the United States approves, and shall account for all monies derived from the sale
of the assets sold by the trustee and all costs and expenses so incurred. After approval by the
Court of the trustee's accounting, including fees for its services and those of any professionals
and agents retained by the trustee, all remaining money shall be paid to defendants and the trust
shall then be terminated. The compensation of the trustee and any professionals and agents
retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and
based on a fee arrangement providing the trustee with an incentive based on the price and terms
of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.     Defendants shall use their best efforts to assist the trustee in accomplishing the
required divestiture. The trustee and any consultants, accountants, attorneys, and other persons
retained by the trustee shall have full and complete access to the personnel, books, records, and
facilities of the business to be divested, and defendants shall develop financial and other
information relevant to such business as the trustee may reasonably request, subject to reasonable
protection for trade secrets or other confidential research, development, or commercial
information. Defendants shall take no action to interfere with or to impede the trustee's
accomplishment of the divestiture.

F.     After its appointment, the trustee shall file monthly reports with the United States
and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this
Final Judgment. To the extent such reports contain information that the trustee deems

12

confidential, such reports shall not be filed in the public docket of the Court. Such reports shall

include the name, address, and telephone number of each person who, during the preceding

month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to

acquire, or was contacted or made an inquiry about acquiring any interest in the Divestiture

Assets, and shall describe in detail each contact with any such person. The trustee shall maintain

full records of all efforts made to divest the Divestiture Assets.

      G.     If the trustee has not accomplished the divestitures ordered under this Final

Judgment within six months after its appointment, the trustee shall promptly file with the Court a

report setting forth: (1) the trustee's efforts to accomplish the required divestiture; (2) the

reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and

(3) the trustee's recommendations. To the extent such report contains information that the

trustee deems confidential, such report shall not be filed in the public docket of the Court. The

trustee shall at the same time furnish such report to the United States, which shall have the right

to make additional recommendations consistent with the purpose of the trust. The Court

thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final

Judgment, which may, if necessary, include extending the trust and the term of the trustee's

appointment by a period requested by the United States.

## VI.  NOTICE OF PROPOSED DIVESTITURES

      A.     Within two (2) business days following execution of a definitive divestiture

agreement, defendants or the trustee, whichever is then responsible for effecting the divestiture

required herein, shall notify the United States of any proposed divestiture required by Section IV

or V of this Final Judgment. If the trustee is responsible, it shall similarly notify defendants. The

notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

      B.     Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from defendant, the proposed Acquirer or Acquirers, any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer or Acquirers, and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

      C.     Within thirty (30) calendar days after receipt of the notice, or within twenty (20) calendar days after the United States has been provided the additional information requested from defendant, the proposed Acquirer or Acquirers, any third party, or the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendant's limited right to object to the sale under Paragraph V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Paragraph V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

14

## VII. FINANCING

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII. HOLD SEPARATE

Until the divestitures required by this Final Judgment have been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. AFFIDAVITS

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or V, defendants shall deliver to the United States an affidavit as to the fact and manner of their compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to any prospective Acquirer, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to

15

information provided by defendants, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.    Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.    Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestitures have been completed.

## X. COMPLIANCE INSPECTION

A.    For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

> 1.    access during defendants' office hours to inspect and copy, or at the option of the United States, to require defendants to provide hard or electronic copies of, all books, ledgers, accounts, records, data and documents in the

16

possession, custody, or control of defendants, relating to any matters

contained in this Final Judgment; and

2.    to interview, either informally or on the record, defendants' officers,

employees, or agents, who may have their individual counsel present,

regarding such matters.  The interviews shall be subject to the reasonable

convenience of the interviewee and without restraint or interference by

defendant.

B.    Upon the written request of an authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, defendants shall submit written reports or responses

to written interrogatories, under oath if requested, relating to any of the matters contained in this

Final Judgment as may be requested.

C.    No information or documents obtained by the means provided in this section shall

be divulged by the United States to any person other than an authorized representative of the

executive branch of the United States, except in the course of legal proceedings to which the

United States is a party (including grand jury proceedings), or for the purpose of securing

compliance with this Final Judgment, or as otherwise required by law.

D.    If, at the time information or documents are furnished by defendants to the United

States, defendants represent and identify in writing the material in any such information or

documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal

Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to

claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United

17

States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI.  NO REACQUISITION

Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XII.  RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII.  EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XIV.  PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States's responses to comments. Based upon the record before

18

the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: 4/28/08

Court approval subject to procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.

_____
United States District Judge

19